UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN JUBELT, Individually, and On Behalf of All Others Similarly Situated.<br><br>Plaintiff,<br><br>v.<br><br>WEIGHT WATCHERS INTERNATIONAL, INC., MINDY GROSSMAN, NICHOLAS P. HOTCHKIN and ARTAL GROUP S.A.,<br><br>Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff John Jubelt ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Weight Watchers International, Inc. ("Weight Watchers" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities class action on behalf of all purchasers of the securities of Weight Watchers between May 4, 2018 and February 26, 2019, inclusive (the "Class Period") seeking to pursue claims under the Securities Exchange Act of 1934 (the "1934 Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the 1934 Act [15 U.S.C. §§ 78j(b) and 78t(a)] and SEC Rule 10b-5 [17 C.F.R. § 240.10b-5]. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the 1934 Act.

3.      Venue is proper in this District pursuant to § 27 of the 1934 Act because Weight Watchers is headquartered in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

4.      In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

## PARTIES

5.      Plaintiff John Jubelt acquired Weight Watchers securities at artificially inflated prices during the Class Period, as set forth in the accompanying certification, which is incorporated herein by reference, and has been damaged thereby.

6.      Defendant Weight Watchers offers a subscription-based weight loss program and is headquartered at 675 Avenue of the Americas, 6th Floor, New York, New York. As of February 1, 2019, Weight Watchers had approximately 67 million shares of common stock issued and outstanding. Weight Watchers common stock was listed and traded in an efficient market on the NASDAQ throughout the Class Period under the ticker symbol "WTW."

7.      Defendant Mindy Grossman ("Grossman") was the President and Chief Executive Officer ("CEO") of Weight Watchers at all relevant times and a member of its Board of Directors.

8. Defendant Nicholas P. Hotchkin ("Hotchkin") was the Chief Financial Officer ("CFO") of Weight Watchers at all relevant times. On August 30, 2018, Defendant Hotchkin sold 131,466 of his personally-held shares of Weight Watchers, reaping more than $9.9 million in gross proceeds. The sale was unusual both as to scope and timing as Hotchkin had not sold any of his personally-held Weight Watchers shares for at least the two prior years.

9. Defendants Grossman and Hotchkin are sometimes referred to herein collectively as the "Individual Defendants."

10. Defendant Artal Group S.A., together with its parents and its subsidiaries (collectively, "Artal"), is the controlling shareholder of Weight Watchers. Defendant Artal acquired Weight Watchers when it was spun-off by H.J. Heinz in 1999. To fund the acquisition, Artal made a $224 million deposit and then caused Weight Watchers to finance the rest of the acquisition consideration through debt issuances. Since then, Defendant Artal has pocketed billions of dollars by selling Weight Watchers' stock and collecting dividends on its remaining holdings. As of March 12, 2018, Defendant Artal owned more than 29.4 million shares of Weight Watchers common stock, or 44.47% of its then-outstanding shares. Via its contractual relationships with Oprah Winfrey, who then owned 11% of Weight Watchers common stock, Defendant Artal exercised effective control over Weight Watchers throughout the Class Period.

11. Defendant Weight Watchers, the Individual Defendants, and Defendant Artal are sometimes referred to herein collectively as "Defendants."

12. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Weight Watchers. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Weight Watchers securities was a success, as it: (i) deceived the investing public regarding Weight Watchers' business metrics and

financial prospects; (ii) artificially inflated the prices of Weight Watchers securities; (iii) allowed Artal and certain Weight Watchers executives and insiders to sell more than a billion dollars of their personally-held Weight Watchers shares at fraud-inflated prices; and (iv) caused plaintiff and other members of the Class to purchase Weight Watchers securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

13.    Historically, Weight Watchers has offered various products and services to assist weight loss and maintenance.  The core philosophy behind the Company's programs is to use a science-driven approach to help participants lose weight by forming healthy eating habits, eating smarter, getting more exercise, and providing support.  Recently, the Company has rebranded itself as "WW" and tried to focus less on weight loss and more on maintaining general health.

14.    Weight Watchers earns revenues from subscriptions for the Company's digital products and by conducting workshops, for which it charges a fee, predominantly through commitment plans, prepayment plans, and "pay-as-you-go" arrangements (collectively, "subscriptions").  Weight Watchers also earns revenues by selling consumer products (including publications) in its workshops, online and to its franchisees, collecting commissions from franchisees, collecting royalties related to licensing agreements, selling magazine subscriptions, publishing, selling advertising space on its websites and in copies of its publications and By Mail product sales.

15.    On February 27, 2018, Weight Watchers announced its fiscal year 2017 financial results for year ended December 31, 2017 ("FY17"), provided its fiscal year 2018 ("FY18") guidance and provided its three-year fiscal 2020 ("end-of-2020") guidance.  For FY18, the Company stated it was on track to report revenues "approaching $1.55 billion and earnings guidance of between $2.40 and $2.70 per fully diluted share," emphasizing that the "guidance

4

reflect[ed] the operating strength of the Company's business and expected continued global momentum through the year." Weight Watchers also stated that it was confident in its ability to reach five million subscribers, driving revenues in excess of $2 billion, by the end-of-2020.

16.     The Class Period starts on May 4, 2018. On May 3, 2018, after the close of trading, Weight Watchers issued a press release announcing its 1Q18 financial results and updated/increased its FY18 financial guidance. The release emphasized that Weight Watchers' "End of Period Subscribers in Q1 2018 [increased] 29% year-over-year to a record 4.6 million," that its "Total Paid Weeks in Q1 2018 [increased] 27% year-over-year," and that its "Revenues in Q1 2018 of $408 million [increased] 24%, or 20% on a constant currency basis, year-over-year." Defendants Grossman and Hotchkin commented on the release stating in pertinent part as follows:

> "Driven by *the enthusiastic, global response to our new WW FreestyleTM program*, we ended the first quarter with 4.6 million subscribers – *the highest level in the history of Weight Watchers and an increase of 1 million* compared to a year ago. *Member engagement has been incredible with members staying longer than ever before. Average retention is now well over 9 months*," said Mindy Grossman, the Company's President and CEO. "The world needs a leader in wellness, and a brand that can bring wellness to all. We aim to be that leader. By delivering a technology experience with human impact, we have the opportunity to expand our purpose and reach allowing us to generate sustainable growth."

> "In the first quarter of 2018, we delivered impressive revenue growth and continued margin expansion, doubling our operating income compared to the prior year quarter," said Nick Hotchkin, the Company's CFO. "*Based on our strong performance and continued momentum, we expect our annual revenue to grow by almost 20% and have raised earnings guidance for 2018*."

17.     Updating and increasing the Company's "Full Year Fiscal 2018 Earnings Guidance," the release stated that "[t]he Company [was] raising its full year fiscal 2018 earnings guidance to between $3.00 and $3.20 per fully diluted share," up from the "[p]rior earnings guidance [of] between $2.40 and $2.70 per fully diluted share," emphasizing that "[t]his

guidance increase **reflects the operating strength of the Company's business and expected continued global momentum through the year**."

18.    On May 3, 2018, also after the close of trading, Weight Watchers conducted a conference call with investors and stock analysts, during which the Individual Defendants provided additional positive commentary about the Company's then present business metrics and financial prospects.  During her prepared remarks, Defendant Grossman again emphasized the Company's strong ongoing momentum in both adding and retaining existing subscribers, stating, in pertinent part, as follows:

> We ended the quarter with 4.6 million subscribers worldwide, the highest level in the history of Weight Watchers, driven by **the enthusiastic global response to our new program**. To put that into context, that's an increase of 1 million subscribers from a year ago. Furthermore, **our average retention is well over nine months, also the highest level in our company history**.
>
> *    *    *
>
> Our impactful program and marketing message resonated with consumers in all of our major markets, **driving strong member recruitment throughout Q1. And in fact, our top global signup days in our history occurred in the first two weeks of 2018**.
>
> *    *    *
>
> In addition to our largest market, North America, **delivering a third strong winter season in a row, our international markets performed very well with our largest Continental European markets, France and Germany, achieving record member recruits in the quarter**.
>
> *    *    *
>
> **The themes that drove our performance in Q1 have continued into the spring season** with integrated marketing campaigns encompassing television, digital, social and leveraging our influencers and ambassadors.
>
> *    *    *
>
> By presenting Weight Watchers, in new ways and with new voices, **we are appealing to a broader audience, who may not have considered Weight Watchers as a program for them in the past**. Looking at the U.S., as an example, **approximately 40% of our member signups in Q1 were new to Weight Watchers, an increase in the proportion of first-time members compared to recent years**. This strong

performance today is a direct result of our execution across all of the elements of our strategic plan: excellent, effective, integrated marketing campaigns and enhanced member experience due to the efficacy and simplicity of our new WW Freestyle program; the enthusiasm and experience of our coaches and ambassadors; and the ongoing enhancements and capabilities found in our mobile app.

*     *     *

***Our business has never been stronger***, supported by a mobile-first technology platform. And agile development approach, (00:10:18) mindset, the beginnings of a brand-led culture with integrated marketing and a relentless focus on consumer insights, as we expand Our Impact Manifesto to encompass wellness. As we make bold moves to capture the opportunities before us, ***I am confident in the sustainability of our growth***, and excited about the new opportunities we have in front of us.

19.     During his opening remarks, Defendant Hotchkin also emphasized the Company's

purportedly ongoing strong subscription and retention momentum, stating, in pertinent part, as

follows:

***Our momentum accelerated in the first quarter of 2018 with strong global recruitment and retention***, driving top line growth and margin expansion. But before I get into the results, for those of you who are newer to our story, the core of our business is our high-margin subscription business model. ***Monthly subscriptions account for approximately 80% of our total revenue, and we are able to use marketing very effectively to drive recruitment***.

Using the U.S. as an example, the majority of our members join with a three month or longer commitment and receive a discount for that initial period, followed by monthly renewals at our full rate of $19.95 a month for online or $44.95 a month to also include meetings.

***We have predictable seasonal trends*** with approximately 40% of our annual member recruitment and annual marketing expense occurring in the first quarter. As such, Q1 bears the lion's share of the costs of attracting new members that captures only a portion of the associated revenue. ***On a global basis, average retention is now well over nine months in both meetings and online, representing more than 15% increase versus three years ago. This reflects improvements in the member experience and increasing engagement with tools like Connect, our social media platform, embedded in our app. We have also seen success in our long-term commitment plan offerings. Looking at the U.S. signups in Q1, 25% chose an initial six-month plan versus only 5% taking the six-month option a year ago***.

***Turning to our Q1 performance, year-over-year recruitment growth rates comfortably exceeded levels attained during our last two winter seasons, bringing our end-of-period subscribers to 4.6 million, up 1 million or 29% from prior year,***

7

*driven by very strong WW online performance. Total paid weeks were up 27% year-over-year in Q1, with double-digit gains in all of our major geographies*.

20.    Defendant Hotchkin also provided updated, increased guidance for FY18 and confirmed the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion, stating, in pertinent part, as follows:

With this Q1 performance and *our spring season off to a good start, we are confident that our top line strength will continue for the rest of 2018. We now expect full-year 2018 revenue slightly north of $1.55 billion, almost 20% growth year-over-year driven by continued member recruitment growth, solid retention, as well as the flow through from the higher subscriber base at the start of this year*. Our guidance assumes we will end 2018 with roughly 4 million subscribers, which would be 25% higher than the 3.2 million end-of-period subscribers in 2017, *setting us up for a revenue and profit tailwind heading into 2019*.

\*    \*    \*

*We're increasing our full-year GAAP EPS guidance to a range of $3 to $3.20*, representing substantial earnings growth compared to 2017, *driven by our continued operating strength*.

\*    \*    \*

To provide a bit more color on our revenue forecast, in North America, our largest market, *we anticipate full year revenues to be up in the mid-teens*. In Continental Europe, we now expect full year revenue to be up in the mid-20% range. And in the UK, we expect full-year revenue to be up in the mid-teens.

\*    \*    \*

And finally, looking further ahead, we recently outlined our three-year goal to increase *our revenue to more than $2 billion in 2020 versus $1.3 billion in 2017*. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention with opportunities in products, licensing, partnerships, B2B and new geographies also contributing to the overall growth picture.

As seen in our performance, *recruitment growth results in gross margin expansion*. In addition, we are managing the business to keep marketing and G&A expenses as a percent of sales relatively flat. Therefore, *we believe we have future margin expansion upside and we expect our growth rate of profit to exceed our growth rate of sales*.

21.    On May 4, 2018, Weight Watchers filed its quarterly financial report on Form 10-Q with the SEC which was signed by Defendants Grossman and Hotchkin (the "1Q18 10-Q").

22.    On May 7, 2018, Weight Watchers filed a Form S-3 shelf registration statement with the SEC that would permit Defendant Artal to sell shares whenever it sought to do so in the future (the "Registration Statement").  The Registration Statement was effective immediately upon filing and expressly incorporated by reference, among other filings with the SEC, the Company's annual report on Form 10-K for the fiscal year ended December 30, 2017, filed with the SEC on February 28, 2018.  Under instructions to Form S-1, Weight Watchers was required to comply with the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") disclosure requirements of Item 303 of Regulation S-K in connection with preparing the Registration Statement.  The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

23.    On May 14, 2018, Weight Watchers filed a final prospectus with the SEC on Form 424b that comprised part of the Registration Statement (with the final prospectus, the "Registration Statement") and priced the secondary stock offering ("SPO") being undertaken for Artal at $69.00 per share.  The Registration Statement stated that Defendant Artal would sell 7.5 million shares on a firm commitment basis, with Defendant Artal willing to sell another 1.125 million shares as the underwriters' overallotment option.  The SPO was a success, with all 8.63 million shares being sold, raising approximately $595.5 million in gross proceeds for Defendant Artal.  The lead underwriters for the SPO, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC and UBS Securities LLC, sold almost all of those shares and collectively shared the lion's share of the more than $28.8 million in underwriting fees and costs.

24.    The Registration Statement stated the following concerning then-present demand for Weight Watchers' product and service offerings and its subscriber growth and retention successes:

> Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, *enable us to attract and retain both new and returning customers*.
>
> \*        \*        \*
>
> As of March 31, 2018, we had approximately 4.6 million subscribers of our digitally-enabled program, including 1.6 million members who also subscribe to our in-person meetings. Through our 360 degree experience, we connect with our members digitally through online content, our social network Connect, 24/7 chat and other social media channels. We also host approximately 30,000 Weight Watchers meetings each week around the world, run by approximately 8,600 leaders, all of whom have deep experience with our program. Our strong brand, together with the effectiveness of our program, loyal customer base, unparalleled network of meetings and leaders and strong digital offerings, *enable us to attract and retain both new and returning customers.*
>
> \*        \*        \*
>
> We have an attractive financial profile with significant growth and *momentum in revenues and subscribers*. We have achieved *eight consecutive quarters of revenue growth* on a constant currency year-over-year basis and have *grown our number of End of Period Subscribers for nine consecutive quarters* on a year-over-year basis.
>
> We achieved our *longest ever average member length of stay of well over nine months* in our most recent quarter. Our subscription-based model *provides a recurring and reliable revenue stream* from meeting fees and Online subscriptions, which together accounted for 83% of our revenues and 86% of our gross profit in the fiscal year ended December 30, 2017. We believe that, with only 5% of U.S. adults who are trying to lose weight using a commercial weight management plan, *we have a significant opportunity to drive increased penetration of and engagement* with our brand. We further believe our deep knowledge of weight management, international presence and brand awareness *uniquely position us for growth* in the global wellness and weight management market.
>
> \*        \*        \*
>
> *Our business has significant momentum* and we believe that we are in *the early stages of realizing the return on our investments*, which we expect *will result in continued growth and profitability*.

25.     Concerning the Company's "***Loyal and Growing Customer Base***," the Registration Statement stated in pertinent part as follows:

> Over our history, we have created a powerful global network of loyal members, growing our customer base to approximately 4.6 million subscribers as of March 31, 2018. Furthermore, our network of service providers who have achieved their weight loss goals on our program provides us with a competitive advantage.
>
> ***The quality, credibility and compelling consumer value of our offerings engender a deep affinity to Weight Watchers and enable us to attract new and returning customers efficiently. Our meeting members have historically demonstrated consistent loyalty to the brand and a significant percentage have repeatedly resubscribed to the program***.
>
> We have also invested heavily in enhancing our digital offerings, ***which has propelled significant growth in our Online business***. Our WW Freestyle program, improvements in our digital platform and services, and effective marketing, including ambassador campaigns, ***have driven recruitment growth and improved our average subscriber retention rate. As of the end of our first quarter of fiscal 2018, our member average length of stay increased to well over 9 months, representing a more than 15% increase as compared to three years ago and is the longest average length of stay in our history. Also, as of the end of our first quarter of fiscal 2018, the number of our End of Period Subscribers increased 28.6% on a year-over-year basis, which was our ninth consecutive quarter of End of Period Subscriber growth on a year-over-year basis***.
>
> The chart below sets forth our year-over-year End of Period Subscriber growth for the periods indicated.



26.     Concerning the Company's "Highly Attractive Business Model and Strong Financial Profile," the Registration Statement stated, in pertinent part, as follows:

We are a global healthy living brand that benefits from a subscription-based model *that generates recurring and reliable revenue*, which allows us to continually make investments to support future growth. The sign-up process encourages new customers to join with a three month commitment at introductory pricing followed by auto-renewal at our normal rate. Our efficient business model features strong gross margins and a variable cost structure, producing high margins with very low cost to serve incremental subscribers across both our meetings and Online businesses. Our Online business is asset-light and highly scalable with centralized infrastructure. Our disciplined cost management approach combined with our low capital expenditure requirements has generated significant cash flows.

27.    On August 7, 2018, Weight Watchers filed its quarterly financial report on Form 10Q with the SEC which was signed by Defendants Grossman and Hotchkin.

28.    On August 6, 2018, after the close of trading, Weight Watchers issued a press release announcing its 2Q18 financial results for the interim period ended June 30, 2018. The release again emphasized that the Company's "End of Period Subscribers in Q2 2018 [increased] 28% year-over-year to 4.5 million," that "Total Paid Weeks in Q2 2018 [increased] 27% year-over-year," and its "Revenues in Q2 2018 of $410 million, up 20%, or 18% on a constant currency basis, year-over-year." Weight Watchers also again "Raised [its] FY 2018 earnings guidance to an EPS range of $3.10 to $3.25," quoting the Individual Defendants who again highlighted the Company's purportedly stellar ongoing subscriber growth, retention successes and profitability trends, stating in pertinent part as follows:

> "Our WW FreestyleTM program is resonating globally, driving *continued strong performance in all of our major markets. We ended the second quarter with 4.5 million subscribers – an increase of 1 million compared to a year ago – as our momentum continued during our first global, summer marketing campaign*," said Mindy Grossman, the Company's President and CEO. "We have embarked on an exciting journey – from being the global leader in weight management to becoming the world's partner in wellness. We are looking forward to the upcoming launch of our first-ever member rewards and loyalty program and to presenting our brand in a new, modernized and culturally-relevant way. We expect that these moves will appeal to both new and existing members who are looking for a partner and a community to inspire their wellness journey."
>
> "*We delivered strong revenue growth and continued margin expansion in the second quarter of 2018, building upon the impressive results we saw earlier in*

*the year*," said Nick Hotchkin, the Company's CFO. "With continued momentum expected in the second half of the year, we have raised our earnings guidance for 2018."

29.     Specifically addressing the increased "Full Year Fiscal 2018 Earnings Guidance," the release stated that the "Company [was] raising its full year fiscal 2018 earnings guidance to between $3.10 and $3.25 per fully diluted share," up from its "[p]rior earnings guidance [of] between $3.00 and $3.20 per fully diluted share," emphasizing that "[t]his guidance increase reflect[ed] the *operating strength of the Company's business* and expected *continued global momentum* through the year."

30.     On August 6, 2018, also after the close of trading, Weight Watchers conducted a conference call with investors and stock analysts, during which the Individual Defendants provided additional positive commentary about the Company's then present business metrics and financial prospects.   During her prepared remarks, Defendant Grossman highlighted the Company's ongoing momentum in both adding and retaining subscribers, stating, in pertinent part, as follows:

> We had another quarter of strong performance in Q2, *with momentum that continued in the spring and throughout the summer*, following the global launch of Invite a Friend and our first Summer of Impact marketing campaign.

> We ended the quarter with 4.5 million subscribers worldwide, an increase of 1 million subscribers from a year ago, *due to continued double-digit member recruitment growth across all of our major geographic markets.*

> And importantly, *our average retention continues to be at record levels of well over nine months. These results demonstrate the global appeal of our WW Freestyle program, supported by strong, integrated marketing execution, and a robust and engaging digital platform*.

> By presenting WW in new ways, *we're starting to attract a broader and more diverse audience, bringing in many new members who may not have considered Weight Watchers as a program for them in the past*.

*Similar to what we saw in the first quarter, in the U.S., more than 40% of our member signups in Q2 were new to WW, an increase in the proportion of first-time members compared to recent years.*

\*     \*     \*

*2018 is on track to be an important and memorable year for WW. Our business is strong, supported by a mobile-first technology platform and agile development approach, a test and learn mindset, focused on consumer insights and a brand-led culture.*

As we make the next steps to move to a holistic wellness platform, we are modernizing our brand to be more culturally relevant to attract a more diverse audience and to drive continued engagement. *I am confident in our strategies to capture the growth opportunities ahead.*

31.     During his opening remarks, Defendant Hotchkin detailed the Company's increased FY18 guidance and reassured investors that the Company remained on track to achieve its end-of-2020 goals of five million subscribers driving in excess of $2 billion in revenues, stating, in pertinent part, as follows:

We are *increasing our full year GAAP EPS guidance* to a range of $3.10 to $3.25, *representing the continuing strong momentum we are driving across all of our major geographies.*

\*     \*     \*

To provide a bit more color on our revenue forecasts, in North America, our largest market, *we anticipate full year revenues to be up in the mid-teens.* In Continental Europe, we expect full year revenue to be up in the mid-20% range. And in the U.K., we expect full year revenue to be up in the low double digits.

\*     \*     \*

*Our business has strong flow-through to operating income. For the full year, for each incremental $1 of revenue, we expect to generate at least $0.50 of incremental operating income.*

\*     \*     \*

Based on continued year-over-year recruitment growth and the current retention, we anticipate exiting 2018 with approximately 4 million end-of-period subscribers, up 800,000 or about 25% from where we ended 2017.

*Given the nature of our subscription business model, we anticipate this higher level of subscribers, when entering 2019, would alone translate into an EPS tailwind of approximately $0.50 in 2019.* Note that this $0.50 positive EPS

impact is independent of any member recruitment assumptions for 2019, effectively assuming flat recruitment year-over-year, and so it's just a quantification of the starting point to assist with modeling.

***We are making solid progress towards our three-year goal to increase our revenues to more than $2 billion in 2020. We expect about 80% of this revenue growth to be driven by continued positive recruitment and improvements in retention, with opportunities in products, licensing, partnerships, B2B, and new geographies also contributing to the overall growth picture***.

32.     Despite having disclosed that the Company had actually lost 100,000 subscribers during 2Q18, because Defendants once again raised Weight Watchers' FY18 financial guidance and made other bullish statements reassuring investors it remained on track to achieve its end-of-2020 goals of five million subscribers driving revenues in excess of $2 billion, the stock price only declined approximately 15% that day.

33.     On August 14, 2018, Defendant Artal sold six million of its personally-held shares through investment banker Morgan Stanley, which had also served as a lead underwriter in the May 2018 underwritten SPO.  Rather than selling these shares through a second underwritten public stock offering, Morgan Stanley sold these shares in individual sales exempt from registration pursuant to SEC Rule 144A, generating $464.34 million in proceeds for Defendant Artal.

34.     On October 2, 2018, Defendant Hotchkins presented for Weight Watchers at the Deutsche Bank Leveraged Financial conference, providing additional positive commentary about the Company's business metrics and financial prospects.

35.     On October 4, 2018, Defendant Hotchkins presented for Weight Watchers at the B. Riley FBR Consumer & Media conference, providing additional positive commentary about the Company's business metrics and financial prospects.

36.     On November 1, 2018, after the close of trading, Weight Watchers issued a press release announcing its 3Q18 financial results.  Weight Watchers reported that it had now ***lost***

*another 300,000 subscribers* in the quarter, bringing its subscriber count down to 4.2 million (from 4.6 million at the end of the 1Q18), causing the Company's reported net revenues of $366 million to significantly underperform the $379 million Defendants had led the market to expect. The Company also reported an adjusted net income of just $0.94 per share, while investors had been led to expect adjusted earnings of $0.99 per share on revenues of $365.8 million based on defendants' bullish Class Period statements.    Though Defendant Hotchkins tried to reassure investors that day that "[h]istorically, approximately 40% of [the Company's] annual member recruitments have occurred during the first quarter," and "[t]herefore, each year first quarter is [its] peak for end of period subscribers and each year end is [its] low point," that only emphasized the problem.    With average subscriber contracts lasting nine months, many, many more subscriptions would be lapsing during 4Q18, precisely when the Company would be signing on the fewest number of new subscribers.    As such, the Company's ability to retain four million subscribers at the end of FY18, much less meet its end-of-2020 goals of five million subscribers driving in excess of $2 billion in revenues, was greatly diminished.    On this news, the price of Weight Watchers common stock declined almost 30% from its close of $68.49 per share on November 1, 2018 and closing down at $48.13 per share on November 2, 2018, on unusually high trading volume of more than 13.8 million shares trading.

37.    As the *New York Post* reported, "[t]he deceleration comes amid intense competition from meal-kit companies like Blue Apron, Hello Fresh, Plated, Whole Foods and growing interest in the high-fat Keto diet."    Indeed, Weight Watchers itself announced on November 1, 2018 that it intended to overcome its drop in subscribers by expanding its tie-ups with third parties such as Amazon.com and Blue Apron Holdings Inc.    As reported by *Blooomberg News* on November 1, 2018, Weight Watchers now planned to open an online

virtual store in January 2019 via Amazon's website. It also worked to develop meal kits with Blue Apron, which will be available in 2019 as well.

38.     However, to keep the price of Weight Watchers securities artificially inflated, the Company's press release issued on the evening of November 1, 2018 emphasized that the Company continued to experience "***continued strong consumer response***" and increased Weight Watcher's FY18 guidance, stating the Company was on track to achieve "fiscal 2018 earnings guidance to between $3.15 and $3.25 per fully diluted share," up from the prior earnings guidance of "between $3.10 and $3.25 per fully diluted share," stating that the new guidance "reflect[ed] the Company's ***strong operating performance***, as well as a lower tax rate." In fact, Defendant Hotchkin opened his remarks during the conference call held with analysts and investors that evening assuring them that Weight Watchers was continuing to experience "***strong subscriber trends***," that it "continue[d] to make ***solid progress towards [its] three-year goal to increase our revenues to more than $2 billion in 2020***," and that it continued to "expect to end 2018 with up to 4 million subscribers, a 12% decline from the Q1 end level, but a 25% increase in level year-over-year."

39.     The statements referenced above in ¶¶15-22, 24-31, 34-36 and 38 were materially false and misleading because they failed to disclose the following material adverse facts which were known to Defendants or recklessly disregarded by them as follows:

a)     that Weight Watchers was experiencing diminished subscriber demand attributable due to the onslaught of new competing smartphone fitness apps, meal-delivery services, and other tech advances was driving down Weight Watchers' new subscriber growth and its subscriber retention rates;

b)      that diminished subscriber growth, when coupled with the much larger number of fourth quarter subscription lapses that Weight Watchers typically experiences, made it highly unlikely that the Company would retain four million subscribers by the end of 2018;

c)      that Weight Watchers was not on track to grow its subscriber count to five million or to drive annual revenues to more than $2 billion by the end-of-2020;

d)      that a decreased subscriber count would result in decreased revenues and profits; and

e)      as a result, Defendants' statements about Weight Watchers' business metrics and financial prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

40.      On February 26, 2019, after the close of trading, Weight Watchers issued a press release and conducted a conference call with investors and stock analysts revealing the Company's actual 4Q18 and FY18 results and financial prospects.  The 4Q18 subscriber count had again declined down to 3.9 million subscribers.  Defendants finally conceded that enrollment would continue declining during FY19, with Defendant Grossman revealing that while January is typically the best time for health-focused brands and when 40% of new subscribers typically join due to New Year's resolutions, January 2019 had been a "hard month" for Weight Watchers. The Company said that it was now only targeting revenues of $1.4 billion during FY19, nowhere near the $2 billion in annual revenues it had been projecting to achieve by the end-of-2020 and well below the nearly $1.7 billion it had led the market to expect for FY19.  Weight Watchers also disclosed that it was now only targeting EPS of $1.25 to $1.50 per share for FY19, far lower than the EPS of $3.36 defendants had led the market to believe even following its prior misses in August and November 2018.

41.     During the conference call, Defendant Grossman acknowledged that the "January time period [was] such a critical component of [the Company's] recruitment for the year," emphasizing that she finally "had to be realistic and transparent about what that meant for the balance of the year," when issuing the dour FY19 guidance.

42.     In response to this news, the price of Weight Watchers common stock declined from its close of $29.57 per share on February 26, 2019, to close down at $19.37 per share on February 27, 2019, on unusually high trading volume of more than 37.4 million shares trading.

## ADDITIONAL SCIENTER ALLEGATIONS

43.     As alleged herein, Weight Watchers and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Weight Watchers, their control over, and/or receipt and/or modification of Weight Watchers' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Weight Watchers, participated in the fraudulent scheme alleged herein.

44.     Certain of Weight Watchers' senior executives and insiders also cashed in on the stock price inflation, selling unusually large amounts of the personally-held shares at fraud-inflated prices, including Defendants Hotchkin and Artal as alleged herein at ¶¶8, 23 and 33.

## LOSS CAUSATION/ECONOMIC LOSS

45.     During the Class Period, as detailed herein, the Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Weight Watchers securities and operated as a fraud or deceit on Class Period purchasers of Weight Watchers securities by misrepresenting the Company's business and prospects.  Later, when the Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Weight Watchers securities fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Weight Watchers securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

46.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

47.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Weight Watchers stock was an efficient market at all relevant times by virtue of the following factors, among others:

a)     Weight Watchers stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient market;

b)     Weight Watchers stock traded in large weekly volumes of millions of shares;

c)     As a regulated issuer, Weight Watchers filed periodic public reports with the SEC and NASDAQ;

d)      Weight Watchers claimed to be eligible to, and did, file SEC Form S-3 registration statements, reserved for large and well-seasoned issuers;

e)      Weight Watchers regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

f)      Weight Watchers was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

48.     As a result of the foregoing, the market for Weight Watchers stock promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all those who transacted in Weight Watchers stock during the Class Period suffered similar injury through their transactions in Weight Watchers stock at artificially inflated prices and a presumption of reliance applies.

49.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased or acquired Weight Watchers stock between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Weight Watchers stock, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Weight Watchers securities during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable.  Weight Watchers securities were actively traded during the Class Period, with an average of approximately 3.7 million shares traded daily.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class as the Company's Form 10-K filed with the SEC on February 26, 2019 reported more than 66.9 million shares outstanding.  Record owners and other members of the Class may be identified from records maintained by Weight Watchers or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a)     whether Defendants violated the 1934 Act;

b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the business, operations and management of Weight Watchers; and

c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants)

56.     Plaintiff incorporates ¶¶1-55 by reference.

57.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

58.    The Defendants named in this Count violated § 10(b) of the 1934 Act and Rule 10b-5 in that they:

a)    employed devices, schemes and artifices to defraud;

b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Weight Watchers securities during the Class Period.

59.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Weight Watchers securities.  Plaintiff and the Class would not have purchased Weight Watchers securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

## COUNT II

### (Violations of §20(a) of the 1934 Act
### Against All Defendants)

60.    Plaintiff incorporates ¶¶1-59 by reference.

61.    The Individual Defendants acted as controlling persons of Weight Watchers within the meaning of § 20(a) of the 1934 Act.  By reason of their positions with the Company and/or their ownership of Weight Watchers stock, the Individual Defendants and Defendant Artal had the power and authority to cause Weight Watchers to engage in the wrongful conduct complained of herein.   The Individual Defendants and Defendant Artal controlled Weight

Watchers and all of its employees. Weight Watchers controlled the Individual Defendants. By reason of such conduct, all Defendants are liable pursuant to § 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.    Declaring that defendants are liable pursuant to the 1934 Act;

C.    Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.    Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.    Such equitable/injunctive or other relief as may be deemed appropriate by the Court.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: March 21, 2019                          Respectfully submitted,

                                               **POMERANTZ LLP**

                                               */s/ Jeremy A. Lieberman*
                                               Jeremy A. Lieberman
                                               J. Alexander Hood II
                                               Jonathan Lindenfeld
                                               600 Third Avenue, 20th Floor
                                               New York, New York 10016
                                               Telephone: (212) 661-1100
                                               Facsimile: (212) 661-8665
                                               Email: jalieberman@pomlaw.com
                                               Email: ahood@pomlaw.com

Email: jlindenfeld@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*